UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

DIMEX LLC, et al.,

    Plaintiffs,

v.

ALBERT B. CHERIS,

    Defendant.

Case No. 2:17-cv-610
CHIEF JUDGE EDMUND A. SARGUS, JR.
Magistrate Judge Elizabeth P. Deavers

## OPINION & ORDER

This matter is presently before the Court for consideration of Plaintiff's Motion for a Temporary Restraining Order. (ECF No. 2.) For the reasons set forth herein, the motion is **DENIED**. The Court commends the parties for their well-reasoned arguments and counsel for their efficient and collegial efforts in expediting discovery and briefing as well as their skilled presentations in court.

### I. Background

The following facts are set forth for the limited purpose of addressing the immediate motion before the Court. Any findings of fact and conclusions of law made by a district court in addressing a request for a temporary restraining order or injunctive relief are not binding at a trial on the merits. *See United States v. Edward Rose & Sons*, 384 F.3d 258, 261 (6th Cir. 2004) (citing *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981)).

According to the Complaint, Plaintiffs, Dimex LLC and Dimex Office Products LLC, are Delaware limited liability companies with their principal place of business in Marietta, Ohio. (Complaint ("Compl.") ¶¶ 2–3, ECF No. 1.) Dimex LLC manufactures various products such as landscape products, masonry products, and industrial matting. (*Id.* ¶ 8.) Dimex LLC owns Dimex

Office Products LLC ("DOP"), which manufactures and sells office chair mats. (*Id.* ¶ 11.) Steve Strife, CEO of Dimex LLC, avers that Dimex and DOP together generate sales of more than $50 million per year and employ approximately 150 employees. (Declaration of Steve Strife ("Strife Decl.") ¶ 3, ECF No. 1-1; Testimony of Steve Strife.)

Defendant, Albert Cheris, is an Illinois resident and since 1972 has been the President of Tenex Corporation ("Tenex"), an Illinois corporation that manufactures various household, office, and industrial products, including floor protection products. (Defendant's Memorandum in Opposition to Plaintiffs' Motion ("Def. Resp.") at 1, ECF No. 16.) Tenex employs approximately forty employees and maintains a corporate office in Illinois and a manufacturing facility in Arkansas. (Declaration of Albert Cheris ("Cheris Decl.") ¶ 2, ECF No. 16-1.)

In 2009, Cheris entered into a consulting and management agreement ("CMA") with both Dimex LLC and DOP to help DOP develop and launch a line of plastic chair mats. (ECF No. 1-2.) The parties later amended the consulting agreement in 2011. (ECF No. 1-3.) Cheris had experience manufacturing and selling chair mats because Tenex had previously manufactured the product, though no longer did, and continued to use the same sheet extrusion process in other areas. Also as part of the agreement, Cheris agreed to grant Plaintiffs a trademark license for the term "Tenex" and a patent license for any patents owned by Cheris related to chair mats. (Compl. ¶ 17.) Plaintiffs allege that as a consultant Cheris had access to confidential information of both Dimex and DOP. (Compl. ¶ 29.) Cheris disputes that he ever received any confidential information from Dimex about products other than chair mats, but acknowledges that he visited Dimex's facility on five occasions, the last taking place in 2011. (Cheris Decl. ¶¶ 8, 11.)

On October 1, 2013, Cheris entered into the most recent and controlling Consulting Agreement with DOP only. (Consulting Agreement at 1, ECF No. 1-4 ("Consultant and DOP . . .

2

have agreed to terminate the CMA as of September 30, 2013 and to enter into this Agreement to replace and supersede the CMA.") The Consulting Agreement contains a Non-Competition clause and a Non-Solicitation clause that prohibit Cheris from offering products that compete with either DOP or Dimex LLC or solicit any employee or customer of the companies for two years after termination of the agreement. (Consulting Agreement §§ 7–8.) Specifically, the Non-Competition clause contains two subparts: § 7(i) prohibits Cheris from selling chair mats in competition with DOP; § 7(ii), and most relevant here, prohibits Cheris from engaging "in any activity or business that is competitive with [Dimex LLC's] business of manufacturing, distributing and selling products other than Chairmats" or from operating any entity that engages in such competition. (*Id.* § 7.) In other words, (i) concerns chair mats and competition with DOP, while (ii) involves all other products sold by Dimex LLC.

On August 5, 2015, DOP notified Cheris that it would terminate the Consulting Agreement effective September 30, 2015. (ECF No. 1-5.) The notification letter reminded Cheris that the non-competition and non-solicitation clauses remained in effect until October 1, 2017. (*Id.*) Plaintiffs assert that in April 2017, Dimex learned that Cheris had offered to sell industrial matting products to several of Dimex's largest industrial matting customers. (Declaration of Kathy Biehl ("Biehl Dec.") ¶ 5–6, Plaintiffs' Hearing Exhibit.) Industrial matting is a product typically used by commercial customers as an anti-fatigue material in flooring subject to a large amount of foot traffic. Both chair mats and industrial matting are produced using a similar sheet extrusion process. Tenex did not sell industrial matting products while Cheris consulted for Dimex, but Cheris alleges that "[w]ell prior to Dimex's incorporation in 1991, Tenex had a Commercial Division that manufactured and sold various industrial matting products to customers—including the same customers that Dimex LLC now claims to be its customers."

3

(Def. Resp. at 4; Cheris Decl. ¶ 13.) Cheris maintains that Tenex's industrial matting product is a result of his own knowledge and experience, and not any information received from Plaintiffs. (*Id.*) Cheris further maintains that Tenex decided to return to industrial matting after a previous customer approached it about making such a product. (*Id.* at 6–7.)

Plaintiffs contend that Cheris, through Tenex, is in violation of § 7(ii) of the Consulting Agreement by manufacturing and selling industrial matting products and marketing those products to customers of Dimex LLC. Plaintiffs allege that they have been harmed as a result of Cheris's actions because its customers have insisted on reduced price quotations after being approached by Cheris. Their Complaint includes claims for breach of contract, misappropriation of trade secrets pursuant to Ohio Rev. Code § 1331.61, and tortious interference with business relations. Plaintiffs have moved for the issuance of a temporary restraining order. The Court held a hearing on July 27, 2017 with respect to Plaintiffs' request for a temporary restraining order only, at which the testimony of Albert Cheris, Darren Bolen, Will Stotsberry, and Steve Strife was presented to the Court.

## II. Standard

The Sixth Circuit Court of Appeals has explained the inquiry involved in addressing either a motion for a temporary restraining order or a preliminary injunction:

> When ruling on a motion for [injunctive relief], a district court must consider and balance four factors: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction.

*Chabad of S. Ohio & Congregation Lubavitch v. City of Cincinnati*, 363 F.3d 427, 432 (6th Cir. 2004) (quoting *Blue Cross & Blue Shield Mut. of Ohio v. Columbia/HCA Healthcare Corp.*, 110 F.3d 318, 322 (6th Cir. 1997) (internal quotations and citations omitted)); *see also Edward Rose*

4

& *Sons*, 384 F.3d at 261 (6th Cir. 2004) (quoting *Washington v. Reno*, 35 F.3d 1093, 1099 (6th Cir.1994)). The Sixth Circuit has further explained that a district court should not consider the foregoing factors as prerequisites to be met; rather, these factors are to be balanced in a weighing of the equities involved. *Edward Rose & Sons*, 384 F.3d at 261. A district court is required to make specific findings concerning each of the factors unless fewer are dispositive of the issue. *Performance Unlimited v. Questar Publishers, Inc.*, 52 F.3d 1373, 1381 (6th Cir. 1995).

### III. Discussion

Upon review of the Complaint and the testimony and exhibits presented at the July 27, 2017 hearing, the Court concludes that a balancing of the factors described above fails to support the issuance of a temporary restraining order in this case.

**1. Likelihood of Success on the Merits**

a. *Breach of the Non-Competition and Non-Solicitation Clauses*

Plaintiffs allege that, by selling industrial matting to customers of Dimex LLC, Cheris is in violation of the Consulting Agreement, which prohibits him from selling any product in competition with Dimex for two years after termination of the agreement. At the hearing, Cheris candidly conceded that on its face the Consulting Agreement does prohibit him from competing against Dimex LLC in the industrial matting market until October 1, 2017. However, it is Cheris's position that § 7(ii) of the Consulting Agreement is overly broad and therefore unreasonable because it prohibits him from selling a product over which he never consulted, discussed, or learned about from Dimex.

Because a non-compete clause, which prohibits a former employee from working in competition with his former employer,[1] amounts to a restraint of trade, such clauses will be

---
[1] Although Cheris was a consultant for Dimex and not an employee, Ohio courts recognize that non-compete

5

enforced only to the extent that the restraints imposed are reasonably necessary to protect the employer's legitimate business interests. *Raimonde v. Van Vlerah*, 325 N.E.2d 544, 546–48 (Ohio 1975). "A covenant restraining an employee from competing with his former employer upon termination of employment is reasonable if it is no greater than is required for the protection of the employer, does not impose undue hardship on the employee, and is not injurious to the public." *Id.* Among the factors courts consider when assessing such reasonableness are:

> The absence or presence of limitations as to time and space, whether the employee represents the sole contact with the customer; whether the employee is possessed with confidential information or trade secrets; whether the covenant seeks to eliminate competition which would be unfair to the employer or merely seeks to eliminate ordinary competition; whether the covenant seeks to stifle the inherent skill and experience of the employee; whether the benefit to the employer is disproportional to the detriment to the employee; whether the covenant operates as a bar to the employee's sole means of support; whether the employee's talent which the employer seeks to suppress was actually developed during the period of employment; and whether the forbidden employment is merely incidental to the main employment.

*Id.* (citing *Extine v. Williamson Midwest*, 200 N.E.2d 297 (Ohio 1964)). Courts have recognized various legitimate business interests under Ohio law, such as an employer's interest in avoiding unfair competition caused by an employee's misuse of confidential information; preventing an employee from using the employer's customer list or contacts; or, preventing an employee from using the skill and training acquired during his employment. *See UZ Engineered Prod. Co. v. Midwest Motor Supply Co.*, 770 N.E.2d 1068, 1080 (Ohio Ct. App. 2001). Covenants not to compete should in general be strictly construed, since such covenants are normally written by the

---

provisions "may extend beyond individuals who perform work as direct employees to also include persons who do work as independent contractors." *Definitive Sols. Co. v. Sliper*, 60 N.E.3d 461, 465 (Ohio Ct. App. 2016) (citing *Am. Healthcare Servs., Inc. v. Akabuaku*, No. 10AP–777, 2010 WL 4705148, at *5 (Ohio Ct. App. Nov. 18, 2010)). Accordingly, the standard used to assess restrictive covenants in an employment contract under Ohio law likewise apply here. *See R.W. Taylor Assocs., Inc. v. Gelrad*, LLC, No. 5:10CV256, 2010 WL 3431166, at *18 (N.D. Ohio May 14, 2010), report and recommendation adopted, No. 5:10 CV 256, 2010 WL 3430777 (N.D. Ohio Aug. 30, 2010).

employer and are in restraint of trade and the right to a livelihood. *Morgan Lumber Sales Co. v. Toth*, 321 N.E.2d 907, 908 (Ohio Ct. Com. Pl. 1974). As such, the burden is on the employer to prove that the restraint is reasonable and the contract is valid. *Arthur Murray Dance Studios of Cleveland v. Witter*, 105 N.E.2d 685, 693 (Ohio Ct. Com. Pl. 1952).

Plaintiffs argue that Ohio courts routinely enforce similar two-year territorial restrictive covenants in order to protect against "loss of control of reputation, loss of goodwill, and consumer confusion." (Pls. Mot. at 7 (quoting *Dealer Specialties, Inc. v. Car Data 24/7, Inc.*, No. 1:15-CV-170, 2016 WL 5341797, at *6 (S.D. Ohio Sept. 23, 2016); *see also UZ Engineered Prod. Co.*, 770 N.E.2d at 1079; *Life Line Screening of Am., Ltd. v. Calger*, 881 N.E.2d 932, 942 (Ohio 2006)).) However, as noted by Defendant, Ohio courts have declined to enforce such covenants where no confidential information is actually obtained or where the employee's expertise was derived through previous experience, and thus imposing a greater restraint than what is necessary to protect against unfair competition. *See Brentlinger Enterprises v. Curran*, 141 Ohio App.3d 640, 648 (2001) (declining to issue an injunction for a non-compete clause where the alleged confidential information a car salesman had access to at his former dealership was readily available or had little value to its competitor); *Darrow v. Kolczun*, No. 90CA004759, 1991 WL 35120, at *2 (Ohio Ct. App. 1991) (restrictive covenant against orthopedic doctor was unenforceable, in part because of the overbroad practice area it restricted and because the doctor obtained the bulk of his skill prior to the employment at issue).

Here, the relevant portion of Section 7(ii) of the Consulting Agreement provides:

> Until the expiration of two years after any termination or expiration of this Agreement (the "Dimex Products Clearance Date"), Consultant will not, directly or indirectly, in the territory served by Dimex prior to such date ("Restricted Area") (i) **engage in any activity or business that is competitive with Dimex's business of manufacturing, distributing and selling products other than Chairmats** ("Dimex's Product Business"). . . . For purposes of this Agreement, a

7

person or entity engages in an activity or business that is "competitive with Dimex's Product Business" if such person or entity conducts, operates, carries out, or otherwise engages in the performance, promotion, sale, distribution, manufacturing or marketing of any product or the provision of any service, of the kind or nature either provided, sold or offered for sale by Dimex's Product Business at any time preceding the Dimex Products Clearance Date. . . .

(Consulting Agreement § 7(ii) (emphasis added).) However, as reflected in the preamble to the Consulting Agreement, Cheris was retained solely "to provide strategic sales and marketing input with respect to DOP's efforts to sell and market Chairmats . . . ." (*Id.* at 1.) Thus, to the extent Cheris did not have any actual involvement and gained no confidential information from Dimex LLC that would benefit him in the industrial matting market, § 7(ii) of the Consulting Agreement is greater than necessary to protect Dimex's legitimate business interests. This interpretation is supported by testimony of Steve Strife, who conceded that if Cheris did not actually receive any information relating to industrial matting, or any other product on which Cheris was not involved, he should not be prohibited from also making those products.

Next, whether Cheris actually gained any confidential information about the industrial matting line of Dimex LLC either directly, or indirectly through his work on the chair mat line, is a factual determination. Based on the testimony presented, the Court finds that the evidence does not support a finding that Cheris obtained any confidential information about Dimex's industrial matting that would allow him to unfairly compete with Dimex.

Cheris maintains that his duties under the Consulting Agreement had nothing to do with industrial matting, that he was never exposed to any confidential Dimex information regarding industrial matting, and that he had no interaction with Dimex's industrial matting customers. (Def. Resp. at 11.) He asserts that his involvement with Dimex throughout the Consulting Agreement was focused entirely on chair mats. Although Cheris did solicit various retail customers on behalf of Dimex to sell chair mats, the parties do not dispute that those customers

8

are distinct from the industrial matting customers who tend to be commercial wholesalers or resellers. Finally, Cheris emphasizes the fact that Dimex hired him specifically for his prior expertise in the plastics extrusion industry. Thus, he argues that this situation is different from the typical non-compete case in which an employee gains new skills and is exposed to confidential information that the employer wishes to protect. (*Id.*) Cheris maintains that the Tenex industrial matting product was developed solely as a result of his prior experience in plastic sheet extrusion and from Tenex having previously sold the product.

Plaintiffs were unable to offer any evidence to rebut Defendant's contentions beyond speculation that Cheris might have learned about Dimex's industrial matting product by virtue of his position as a consultant on the chair mat line. Each of the Dimex representatives at the hearing—Steve Strife, Darren Bolen, and Will Stotsberry—testified that to their knowledge Cheris was never given any information, documentation, or specification about Dimex's industrial matting product or customers. Nor do Plaintiffs contend that the industrial matting product itself, the raw material, or the plastics extrusion process generally is proprietary or exclusive to Dimex. Instead, Plaintiffs primarily assert that since Cheris and Tenex employees had previously visited the Dimex manufacturing floor, they could have observed the industrial matting production line from which they could infer the cost structure behind the product.

Cheris testified that he personally visited the Dimex facility in Marietta, Ohio on five occasions, the last of which was in 2011, but only saw the manufacturing floor on two or three of those visits. He further testified that a Dimex represented always escorted him and that he only observed the chair mat production line; he did not recall ever seeing the industrial matting line. Darren Bolen, Plant Manager at Dimex, testified that he did not personally escort Cheris when he visited and could not say whether Cheris observed anything other than the chair mat line.

9

Likewise, Steve Strife, CEO of Dimex LLC since January 2016, was not working at Dimex when Cheris visited the facility.

Unable to establish that Cheris witnessed the industrial matting line directly, Plaintiffs allege that his observation of the chair matting line is still harmful because the production of each product is similar. Darren Bolen provided testimony describing the step-by-step plastic sheet extrusion process. In short, the process begins with raw plastic pellets, which are placed into an extruder (a long barrel with an auger and screw) and heated to approximately 350 degrees until they melt and becomes fluid. A sheet die is then used to spread the fluid into a particular size and thickness sheet, after which it is calendered (pressed) through two large rolls, cooled, pulled, and cut into the final product. Bolen stated that this process is essentially the same for both chair mats and industrial matting, apart from the hardness of the material and end format: chair mats are harder and sold in individual sheets, whereas industrial matting is sold in rolls. According to Bolen, Dimex uses a "three stack" calendaring system for its industrial matting line as opposed to two for its chair mats. Bolen also acknowledged that this process is not unique to Dimex and is fairly standard throughout the sheet extrusion industry. He also confirmed that a competitor would be able to buy the same raw material and equipment on the open market.

What differs among manufacturers and what Cheris would have been able to observe from Dimex's chair matting process is the floor space and infrastructure dedicated to the equipment, the rate of movement at which the equipment is operated (energy cost), and the amount of labor used to staff the line. Dimex maintains that these factors are proprietary and confidential because the cost structure of the product could be gleaned if these factors are known. For instance, according to Steve Strife, the rate of speed of the equipment is important because each product runs at a different speed, which can determine the quality and cost of the product—

a faster speed lowers the cost but could also lower the quality, so it is a balance. Dimex suggests that given the temporal proximity of Cheris's access to Dimex's facility and the release of his own similar product, that Cheris could not have independently produced such a product in the same time period.

It is not clear, and there was no testimony presented, that these particular factors with respect to chair matting would apply equally to industrial matting. Given that the end product is different, the specifications would also have to be different, as Strife at least recognized with respect to the speed of the equipment. Strife further confirmed that Dimex's chair mats and industrial matting are created using separate equipment, so it is not the case that Dimex simply inserted different raw material into the same machines that Cheris saw. Thus, Cheris's observation of the chair matting line is only evidence that he obtained confidential information about chair mats, which he does not dispute. Strife also offered several possibilities for how Cheris could offer a similar product at a lower price: he could be using different material, he could be producing it at a faster speed or on larger equipment, or he might simply be willing to accept a lower profit margin. Additionally, Cheris testified that it took approximately six months to develop Dimex's chair matting line, about the same amount of time it took Tenex to develop its new industrial matting line.

Next, Dimex alleges that Cheris gained firsthand knowledge of Dimex's industrial matting product because "a Tenex employee photographed and researched Dimex's products while at the Dimex facility." (Pls. Mot. at 5.) According to the declaration of Steve Strive, employees of Dimex encountered a Tenex employee taking unauthorized photographs of the chair mat production line and that he further believes the employee may have photographed the industrial matting product line. (Strife Decl. ¶ 14.) However, when asked whether he had any

11

basis for this allegation, Strife responded that he did not. Cheris testified that Tenex had offered to assist Dimex if it had issues operating the chair mat production equipment, which Dimex later requested. While assisting with the equipment, a Tenex employee took two photographs—one of the sheet die up close and one of the finished chair mat—in order to show Dimex the correct positioning of the equipment to achieve the desired result.

Darren Bolen confirmed that the Tenex employee was observed taking photographs of the chair mat line some time in 2010, and that when asked to delete them he did. Cheris maintains that he was never sent or saw any such photographs. Bolen further suggested that the two Tenex employees were not supervised the entire time while on the manufacturing floor so they might have observed other production lines. However, he did not actually know if they observed anything other than the chair mat line. Otherwise, there was no evidence presented beyond the fact that two photographs were taken of the chair mat line and then promptly deleted.

Plaintiffs also presented the testimony of Will Stotsberry, Production Manager for Dimex LLC, who testified about a phone call he received from Cheris sometime in 2016. Stotsberry testified that Cheris requested a sample ring of Dimex's industrial matting products because he was interested in installing one of its products in the Tenex facility in Arkansas. The Dimex sample ring consists of approximately thirty swatches of Dimex's industrial matting products, which its sales representatives use to demonstrate the various textures and embossing features to prospective customers. Because Stotsberry thought that the request was unusual, he instructed Dimex employees not to send any samples to Cheris if asked. Stotsberry did not send Cheris the sample ring and Cheris confirms that he never received one. Cheris admits that he may have misrepresented his intentions to Stotsberry to induce him to send the samples. In truth, he concedes that he wanted to see the product samples to evaluate whether he could make a viable

competing product. Despite this admission, there is no evidence that Cheris ever actually received Dimex's product samples. Even if he had, Dimex concedes that their sample ring is not confidential and is often given to prospective customers without any expectation of confidentiality.

The Court finds credible Defendant's position that Tenex is capable of producing an industrial matting product based on Cheris's expertise and the company's past experience selling industrial matting, rather than in reliance on confidential Dimex information. Cheris testified that he began working at Tenex in 1966 under his father and has been the president of the company since 1972. Tenex first sold transparent carpet protectors manufactured using the same sheet extrusion process at issue. It then started selling chair mats in 1975, but later sold that portion of the business in 2001. Tenex manufactured and sold industrial matting from the late 1970s to the late 1980s or early 1990s. According to Cheris, Tenex sold two main industrial matting products—called "Advantage" and "Carpet Guard"—to approximately fifteen commercial customers, which included Wearwell, Superior (now Notrax), Durable Corporation, Cactus Mat, and American Floors Mats. Among the customers Plaintiffs now allege that Tenex has solicited as to new industrial matting include Wearwell, Durable, and Notrax. Thus, it is plausible, as Cheris asserts, that Tenex is reaching out to its former customers rather than simply targeting customers of Dimex.

Ultimately, Cheris testified that he decided to sell industrial matting because he believed that Dimex had purchased its primary competitor in the industrial matting market, RJF International Corporation ("RJF"), and he believed the high prices charged by Dimex made for an opportunity to re-enter the industrial matting business. He also received advice from new legal counsel stating he could enter the market without violating the non-compete clause.

In sum, Plaintiffs have not established the likelihood that Cheris is in breach of a valid non-compete clause by selling industrial matting given that he was only exposed to confidential information on chair mats.

b. *Misappropriation of Trade Secrets*

As to the claim for misappropriation of trade secrets, to prevail, a plaintiff must show (1) that a trade secret exists; (2) that the defendant acquired the trade secret as a result of a confidential relationship; and (3) that the defendant engaged in unauthorized use of the trade secret. *Heartland Home Fin., Inc. v. Allied Home Mtg. Cap. Corp.*, 258 F. App'x 860, 861 (6th Cir. 2008).

Plaintiffs allege that, in his capacity as a consultant, Defendant obtained confidential information from Dimex LLC about its industrial matting production and is now using that information to manufacture and market a similar competing product to Dimex's customers. Under the Consulting Agreement, Cheris acknowledged that the service he will provide will "require him to have access to certain confidential information of or relating to DOP or Dimex," which he agreed to not disclose. (Consulting Agreement § 6.) However, as already discussed above, there is no evidence establishing that Cheris obtained any confidential or trade secret information with respect to Dimex's industrial matting line. Rather, he only obtained information regarding the chair matting line, which he is not alleged to have misappropriated. Plaintiffs have therefore not established a likelihood of success on this claim.

c. *Tortious Interference*

To prevail on a claim for tortious interference of a contractual or business relationship, the plaintiff must show: (1) the existence of a contractual relationship; (2) knowledge of the relationship by the tortfeasor; (3) an intentional and improper act by the tortfeasor interfering

with the contractual or business relationships; (4) lack of privilege on the part of the tortfeasor; and (5) resulting damages." *AK Steel Corp. v. Miskovich*, No. 1:14CV174, 2014 WL 11881030, at *6 (S.D. Ohio Mar. 3, 2014).

Here, Plaintiffs assert that "Cheris used the confidential information he gained from Dimex in order to solicit Dimex's customers away from Dimex." (Pls. Mot. at 14.) Again as established above, there is no evidence that Cheris actually received confidential information from Dimex regarding its industrial matting line. Additionally, Dimex acknowledges that the identities of its customers are not confidential. Indeed, Cheris posits that the identity of those customers is easily ascertainable by performing a simple search for anti-fatigue mat manufacturers on the internet. (Def. Resp. at 14.) Additionally, Cheris's testimony establishes that the customers Tenex is currently soliciting were customers of Tenex from when it previously sold industrial matting. Moreover, the parties do not seem to dispute that the customers Cheris solicited on behalf of Dimex to sell chair mats were different customers from those who would purchase industrial matting. The Consulting Agreement even specifies the four accounts with whom Cheris worked on behalf of Dimex—Costco, Sam's Club, BJ's Wholesale, and Floortex—none of whom Cheris has approached to sell industrial matting. The likelihood of success on this claim also weighs in Defendant's favor.

### 2. Remaining Factors

As set out above, Plaintiffs offer no evidence from which a finder of fact could find by a preponderance that Cheris obtained confidential information regarding Dimex's industrial matting product. Thus, in the Court's view, this factor weighs against issuing the temporary restraining order.

Plaintiffs assert that they are likely to suffer irreparable harm because several of Dimex's

largest customers have demanded reduced price quotations. Further, Plaintiffs are harmed by Cheris's ability to represent himself as a former consultant for Dimex, thus enhancing credibility with customers when discussing their competing products. Cheris argues that it is not clear Dimex will suffer irreparable harm given that they waited four months to seek injunctive relief after discovering his competing business. However, Steve Strife testified that while other Dimex employees suspected Cheris had entered the industrial matting market, he did not personally confirm the suspicion until June 2017. Thus, the supposed delay in filing this action is not unreasonable.

Strife also testified that RJF has reentered the industrial matting market after the expiration of its non-compete agreement in March 2017. In fact, Strife originally thought that the rumors concerning a competing industrial matting product were in reference to RJF, when ultimately it turned out to be Tenex. Strife confirmed that both RJF and Tenex are now competing with Dimex in the industrial matting market and that RJF may be soliciting the same customers as well. Thus, there is at least some doubt as to whether the harm Dimex is facing is the result of competition from Tenex or RJF.

Next, Cheris argues that issuance of a temporary restraining order would not only cause substantial harm to himself, but also to non-party Tenex and its employees, by preventing them from fairly competing in an industry in which they have longstanding experience. Cheris and Tenex would undoubtedly be harmed by the loss of potential revenue from their industrial matting product, though it is not clear to what extent. Cheris testified that he might have to close Tenex if the Court were to issue the temporary restraining order. He also stated that approximately one third of Tenex's business is comprised of floor protection products, while the remaining two thirds and majority is in recycling, and therefore unrelated. This factor leans in

Defendant's favor to some extent.

Finally, while the public interest is generally served by enforcing the terms of a contract that was negotiated and entered into between two sophisticated parties, it is also served by protecting employees from overly broad restrictive covenants. Allowing Cheris to compete in the market also promotes free and fair competition and gives consumers greater choices. While there are valid interests on both sides, this factor weighs in Defendant's favor considering the Court's determination that the restrictive covenants are overbroad to the extent they apply beyond chair mats.

Accordingly, pursuant to Rule 65, a temporary restraining order is not appropriate in this case.

### IV. Conclusion

For the foregoing reasons, Plaintiffs' Motion for Temporary Restraining Order (ECF No. 2) is **DENIED**.

**IT IS SO ORDERED.**

\_\_8-1-2017\_\_
**DATE**

_____
**EDMUND A. SARGUS, JR.**
**CHIEF UNITED STATES DISTRICT JUDGE**